DECISION.
{¶ 1} The defendant-appellant, Richard Timerding, appeals from the judgment convicting him, after trial by a jury, of two counts of aggravated arson in violation of R.C. 2909.02(A)(1) and2909.02(A)(2). The trial court sentenced him to concurrent prison terms of five and three years. In his two assignments of error, he contends that (1) the evidence was insufficient to sustain his conviction, (2) the judgment was against the manifest weight of the evidence, and (3) the trial court did not merge the two sentences as required by R.C. 2941.25. We affirm the trial court's judgment.
 {¶ 2} Timerding lived in the third-floor attic apartment of a three-story multiplefamily building on Crown Avenue in Cincinnati. On October 12, 2003, he was drinking beer and listening to music with others in the second-floor apartment of Jean Adkins and Garnett Shaffer. By 10:00 p.m., he had become so intoxicated that Shaffer refused his request for another beer. He became angry and left.
 {¶ 3} When Shaffer realized that Timerding had one of her movies on videotape, she went to his apartment and knocked on his door. No one answered. She opened the door and looked inside, but saw no one. She saw no smoke or fire. After walking down several stairs to the second floor, she was able to look outside through a window. She saw Timerding standing outside the building, holding a gas can. She shouted to him, asking if he would bring up her video. He replied that he would be up in a minute. Five minutes later, Timerding rushed into Shaffer's and Adkins's apartment, shouting that his apartment was on fire. Shaffer quickly took her dogs and left the building. Adkins and Randy Stevens, a friend, ran upstairs to Timerding's apartment. They looked inside and saw that the apartment was engulfed in fire and smoke. They then grabbed Timerding's cat and Adkins's two dogs and fled from the building.
 {¶ 4} When the firefighters arrived, they were told that Paul Burns, who resided in an apartment also located on the second floor, was still inside. As smoke spread through the second floor, the firefighters succeeded in waking Burns by knocking on his door and shouting. After he came to his apartment door, they escorted him safely out of the building.
 {¶ 5} Upon entering Timerding's apartment, firefighters found a gasoline can floating in the bathtub. Paul McMullen, a fire investigator who headed Norwood's Bureau of Fire Safety, arrived an hour after the fire was reported and after it had been extinguished. He found heavy damage to the living-room ceiling joists, indicating to him that there had been intense heat in that area. Directly below the ceiling joists were discolored floorboards. McMullen testified that the discolored floorboards were evidence of the fire's point of origin. The grooves or gaps in the floorboards were burned from the bottom of the grooves upward, which, according to McMullen, was typically caused by the use of gasoline or an ignitable liquid since fire burned upward. Nothing was found in the area of the burn pattern that suggested another source of ignition. During his inspection, McMullen saw nothing smoldering in the other areas of the apartment to suggest a slow-burning fire caused by a cigarette. His examination of the electrical outlets eliminated an electrical malfunction as the cause of the fire.
 {¶ 6} At 1:00 a.m., Green Township Fire Inspector Steve Claytor, who had been called to the scene by McMullen, arrived at the apartment with an "arson dog" trained to detect the presence of certain accelerants. The canine had been previously deployed at five hundred fire scenes. The dog indicated the presence of an accelerant in the center of Timerding's living room. Under the living-room carpet, where the dog had indicated there was an ignitable liquid, McMullen found that the floorboards were "alligatored." He testified that the pattern suggested to him that the fire at this point was fast-burning and fueled by an accelerant. McMullen concluded from his visual inspection of the building's exterior that the "V" burn pattern suggested that the fire had started at a central point and had burned out and up.
 {¶ 7} Later McMullen and Claytor took the dog to the Norwood police station where Timerding was being questioned. The dog indicated that there was accelerant on Timerding's shoes and pants leg. They saw that Timerding's pants leg was burned at the knee and that his skin was red where it poked through the clothing. They also noted that his beard and hair were singed.
 {¶ 8} Two days after the fire, a forensic scientist at the coroner's crime laboratory, using a gas chromatograph mass spectrometer, analyzed floorboards from Timerding's living room and samples of his clothing. He found gasoline on the shoes, T-shirt, and pants Timerding was wearing on the night of the fire. Although he found residue of terpene, a chemical hydrocarbon that occurs naturally when soft woods burn, he did not find the presence of an ignitable liquid in the floorboard samples. He testified that accelerants were not found in 40% to 50% of all suspected arsons because they were either consumed by the fire or so diluted by water and foam that they did not register on the gas chromatograph mass spectrometer. He also testified that an accelerant may have become so diluted on the test sample that it did not register on the gas chromatograph mass spectrometer, but yet might still remain detectable by an arson dog.
 {¶ 9} Timerding steadfastly denied any knowledge of how the fire started. He told the police that he first discovered the fire when he went to his apartment to retrieve Shaffer's videotape. He explained that he regularly worked on lawnmowers, and that the reason he kept the gasoline can in his bathtub was because people had stolen his cans if he kept them outside.
 {¶ 10} In his first assignment of error, Timerding challenges the weight and sufficiency of the state's evidence to support his convictions, as well as the trial court's denial of his Crim.R. 29 motion. To prove the aggravated-arson counts against him, the state was required to show that Timerding, by means of fire, had knowingly created a substantial risk of serious physical harm to the occupants of the apartment building under R.C. 2909.02(A)(1) and, by the same means, had knowingly caused physical harm to the occupied structure under R.C. 2909.02(A)(2).
 {¶ 11} The issues of weight and sufficiency involve two separate tests on review. Sufficiency is essentially a test of adequacy and asks whether, if the state's evidence is believed, it is sufficient to support a conviction. See State v.Thompkins, 78 Ohio St.3d 380, 390, 1997-Ohio-52, 678 N.E.2d 541
(Cook, J., concurring). On the other hand, a weight-ofthe-evidence review requires an appellate court to sit as a "thirteenth juror" and to reweigh the evidence to determine if the jury in reaching its verdict "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id. at 387,678 N.E.2d 541; see State v. Martin (1983), 20 Ohio App.3d 172,175, 485 N.E.2d 717. Reversal on this basis is reserved strictly for the exceptional case and is not based on any mathematical formula, but upon the effect of the evidence to induce belief. See Thompkins at 387, 678 N.E.2d 541.
 {¶ 12} "Circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof." State v. Jenks
(1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph one of the syllabus "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Jenks, supra, at paragraph two of the syllabus.
 {¶ 13} Although the state's case was based on circumstantial evidence, the jury could reasonably have inferred that Timerding started the fire. Immediately before the fire, Timerding, who had been involved in a row with his neighbors when they refused to serve him more beer, was seen holding a gasoline can in front of his apartment building. Five minutes later, his apartment was burning. If that were not enough, firefighters later found a gasoline can in the bathtub of his apartment, and when they questioned him, they found that his pants were burned at the knee, that the skin poking through was red, and that his hair and beard were singed. Even more damning, he was discovered to have gasoline on his clothing after an arson dog had already indicated the presence of an accelerant in the living room of his apartment. Finally, investigators concluded from the burn patterns that the fire was typical of arson.
 {¶ 14} We hold that the record contains substantial, credible evidence from which the jury could have reasonably concluded that the state had proved all elements of the two aggravated-arson counts beyond a reasonable doubt. See State v. Waddy (1991),63 Ohio St.3d 424, 588 N.E.2d 819, certiorari denied (1992),506 U.S. 921, 113 S.Ct. 338. The trial court also properly overruled Timerding's motion for a judgment of acquittal, as reasonable minds could have reached different conclusions on whether each element of the crimes, including Timerding's identity, had been proved beyond a reasonable doubt. Crim.R. 29; see, also, Statev. Bridgeman (1978), 55 Ohio St.2d 261, 381 N.E.2d 184; Statev. Guidugli, 157 Ohio App.3d 383, 387-88, 2004-Ohio-2871,811 N.E.2d 567.
 {¶ 15} Timerding also argues under his first assignment of error that his conviction was contrary to the manifest weight of the evidence. He maintains that the arson dog detected only terpene in the floorboards, and that the forensic scientist found no evidence of an accelerant. He argues further that without eyewitnesses the state failed to prove beyond a reasonable doubt that the fire was the result of arson. In his view, the jury should have accepted his explanation to police that there was gasoline on his clothing because he had been working on a lawnmower on the same day as the fire, as verified by his single witness. Finally, he remonstrates that the jury should have been persuaded by the argument of his trial attorney that, as a pet lover, he could not have set fire to his own apartment and left his cat and two dogs behind to be burned.
 {¶ 16} Our review of the record fails to persuade us that the jury, sitting as the trier of fact, clearly lost its way and created such a manifest miscarriage of justice that Timerding's conviction must be reversed and a new trial ordered. The jury was entitled to reject Timerding's explanation that he did not set the fire and that gasoline was on his clothing because he worked on lawnmowers, even if verified by his single witness. The weight to be given the evidence and the credibility of the witnesses were primarily for the trier of fact to determine. See State v.DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.
 {¶ 17} The state's forensic scientist also discredited Timerding's hypothesis that the arson dog had reacted only to the terpene in the floorboards. He testified that terpene was not a typical hydrocarbon in the same sense of a petroleum distillate and could not be confused with gasoline. Perhaps even more damning was the fact addressed by the prosecutor in closing argument that, in order to have burned his pants leg and singed his hair and beard, Timerding would have had to do more than just open the door and discover the raging fire, as he claimed, but, rather, would have had to have been inside the apartment during the fire.
 {¶ 18} In its instructions to the jury, the trial court supplemented the standard instructions on circumstantial evidence, giving the following example: "[I]f a witness testifies that he arrived in the kitchen only to see Johnny standing there with the empty tin in his hand and cherry pie on his face, that would be circumstantial evidence that Johnny ate the pie." The same can be said of Timerding when Shaffer saw him at 10:00 p.m. with a gasoline can in his hand, five minutes before he alerted Adkins and Shaffer that the fire was burning out of control in his apartment. The fact that Shaffer saw no fire or smoke inside his apartment just five minutes before Timerding reappeared at their apartment door shouting fire seems more than just a mere coincidence, particularly when the fire inspectors later found a gas can in Timerding's bathtub, and traces of accelerant in Timerding's apartment were detected by the arson dog.
 {¶ 19} Timerding's first assignment of error is overruled.
 {¶ 20} In his second assignment of error, Timerding argues that he could only be sentenced on one count of aggravated arson, as the two counts involved allied offenses of similar import under R.C. 2941.25. We have previously held that the statutorily defined elements in R.C. 2909.02(A)(1) and 2909.02(A)(2) do not correspond when compared in the abstract as required by the test in State v. Rance, 85 Ohio St.3d 632, 636-638, 1999-Ohio-291,710 N.E.2d 699. See State v. Campbell, 1st Dist. Nos. C-980874 and C-980872, 2003-Ohio-7149.
 {¶ 21} Timerding's second assignment of error is overruled.
 {¶ 22} Accordingly, the judgment of the trial court is affirmed.
Judgment affirmed.
Doan, P.J., and Sundermann, J., concur.